Good afternoon, Your Honors. Good afternoon. Robert Chambers with Peter Saragelis on the brief for the Plaintiff-Appley ISB Mutual. First, I'd also like to thank the Court for accommodating my schedule. I had to be in the Seventh Circuit this morning. I will take about ten minutes. We are a very considerate Court. I appreciate that. Judge Corey Berman, Michael Flaherty, representing the Defendant's Appellants, Brooks, Adams & Tarulis, et al., the Attorneys, and I would take about 12 minutes, reserving three minutes for rebuttal. Okay. Why don't you proceed with your argument, Judge? Thank you, Judge. May it please the Court, the trial court erred in this case in finding that there was any sort of misrepresentation made by the Defendant, Attorneys, and the law firm on the 2008 application. The procedural posture of this case is really where this appeal starts. The parties filed cross motions for summary judgment on the basis of whether a misrepresentation was made on the 2008 application. The relevant question was Question 21A on the new business application that ISBA had provided to the Defendant Appellant Law Firm, and Question 21A is worded as follows. During the past five years, has any claim been made against an appellant or a predecessor firm, any current member of applicant or a predecessor firm, to your knowledge, any former member of applicant or a predecessor firm? The answer to that question was no. That answer was truthful at the time, and the answer remains truthful to this day. The issue that came up on summary judgment was whether a claim had been made within the five-year period. The language of Question 21A focused on the words claim and made. In Question 21B, the ISBA distinguished between the word claim and the word suit. They divided up the question saying, is any current member of applicant aware of any circumstance or incident that may result in a claim or suit? Mr. Berman, at the time that the application is filled out and completed, does the prospective insured have a copy of the policy itself? No. So does the definition of a claim within the policy itself have any relevance to the application? The applicant is not given a definition of the claim. Certainly when the policy is issued, the word claim is defined in the policy. But not at the time of the application, the prospective insured does not have a copy of that? That is correct. That is correct and ISBA's representative testified to that fact, as did the applicant. So the application in Question 21B distinguished between a claim and a suit. This case should have been disposed of on summary judgment in favor of the attorneys based on a finding that there was no misrepresentation that a claim had not been made within five years prior to the policy period. The undisputed facts established that the 2008 application was tendered on or about December 13, 2007. More than five years, about five years and a week or so prior to the tender of the application, the law firm that Mr. Douglas Tibble was with at the time, Holland and Knight, had received and tendered a claim to its then-carrier, CNA, of a claim that had been made by a client of Mr. Tibble's, a client of the Holland and Knight firm, by the name of Tango Music. Earlier in 2002, Mr. Tibble had been found by Federal District Judge Grady to have neglected a case in Federal court. Mr. Berman, really, with all due respect, we're all familiar with the facts, and rather than consume all your time with telling us about what we've read in your both sides' excellent briefs, why don't you get to your argument so that we can focus on it? Certainly. We know the facts, I think. Oh, I'm sorry. Mr. Berman, can I ask a question? This starts with the rescission of the 2009 policy, correct? Two policies were rescinded, 2008 and 2009. Right, 2008 and 2009. On the 2009 policy, is there any difference between the content of a renewal policy and a new policy? There is a difference in the content of the application for the renewal policy. But the policies themselves are the same, approximately? I haven't looked specifically as to the exact similarity, but yes, I think they are substantially similar as far as coverage. And the renewal policy application is not in the record, the 2009 application?  No. Okay. One of our arguments is that Section 154 of the Insurance Code, which is the section upon which ISBA needs to use to rescind a policy, is a mandatory section, and it requires that a misrepresentation must, quote, have been stated in the policy or endorsement or  endorsement of the policy. And the 2009 application for renewal was not part of the record, correct? ISBA did not introduce that into the record at trial, that's correct. Why did the Court rescind the 2009 policy? That's a very good question. The Court should not have rescinded the 2009 policy. There was no basis under the statute to rescind the 2009 policy. What about under the record? What the Court said is that it appeared to her that the 2009 policy should fall because the 2008 policy fell. And that is the rationale that the Court used to rescind the 2009 policy. That rationale is not found within the statute, though. I apologize. That's why I'm asking you, I guess in a straightaway manner, is there a contingency in the 2009 policy related to a 2008 application or 2008 policies? In other words, if the 2009 policy was a new policy, would there have been a basis for seeking rescission of the 2009 policy? If the 2009 policy had the same application that the 2008 policy had, then the answer would be no, because there was no misrepresentation in the 2008 policy, and the same arguments would apply to the 2009 policy. But the 2009 application did not incorporate the 2008 application. It was a stand-alone application. I suppose the ISBA could have incorporated, could have asked to supplement any prior applications, but it did not do so, and it did not introduce any evidence that would have supported a rescission of the 2009 policy. This was not an automatic renewal policy. The statute, section 154, does not exempt renewal applications. The statute hinges rescission on the application that gave rise to the policy. So is this simply a contract construction case, a policy construction case? With respect to the 2008 policy, it is an interpretation case of the meaning of the policy, that in an insurance policy or an application, that is to be construed against the insurer and in favor of the insured. And to the extent that the court finds that the word claim, as used in this application, was ambiguous, then coverage is favored. The interpretation of claim comes down to, we have a claims-made and a reported policy. And there can only be one claim on a claims-made and reported policy when that claim arises out of the single act or remission. So the basic rationale that was argued by ISBA and accepted by the trial court, that the lawsuit that was filed several years later, in 2005, was a, quote, claim, was not correct because a claims-made and reported policy is locked into place as of when a claim is tendered to the carrier. And the CNA letter shows that that was done more than five years prior to the date of the application. The lawsuit that was filed several years later was a follow-on to the claim that had been previously submitted, but it was not a claim. And therefore, the answer to the question, was a claim made within five years prior to the date of the application, was truthfully, no, because the lawsuit was not a claim. The court could have, if the court was considering the ambiguity of that word claim, the court could and should have considered the testimony of an industry expert, John Doar, who testified he had plenty of experience in the property and casualty industry. And he testified that the property and casualty industry would not consider that lawsuit that occurred in 2005 to be a new claim because, again, you can only have one claim on a claims-made and reported policy. But that got a little confusing in that the determination had been made that a misrepresentation had been made at the summary judgment stage. At the time you identified and proposed the expert, that was really at the trial phase of whether the previously found misrepresentation was material. So it's confusing to try to then juxtapose what the court should have done under your version. Should she have vacated her previous summary judgment order in the middle of her materiality trial? You know, I mean, it's sort of apples and oranges to me. Well, the motion to reconsider was filed prior to trial. I understand. And, of course, the summary judgment ruling was interlocutory. So it could be reversed, vacated at any time by the trial court. So I don't know that the court necessarily needed Mr. Doar's testimony, but it certainly was available through his deposition testimony, which was first submitted. And then, again, we made an offer of proof through Mr. Doar at trial. No doubt. But I'm specifically referring to the motion to reconsider that preceded the trial. The trial court should have, if the court was going to consider the word claim ambiguous, it could have then resorted to extrinsic evidence, which Mr. Doar's interpretation and explanation of the industry was. So the court erred, number one, in determining that the Tango Music lawsuit was a claim and should have found that there was no misrepresentation, should have found that summary judgment was appropriately entered in favor of the attorneys and law firm and not in favor of ISBA, and the case should have concluded at that time. The court did not do that, and the court held a trial on materiality. Because under the court's reasoning, the Section 154 code provision requires a materiality finding. So we get then to the issue of materiality. The ISBA contends that the Tango Music lawsuit was material to it. That position was a bit disingenuous before the trial court and remains a bit disingenuous. There's no question, no question whatsoever, that ISBA would have had no exposure to the Tango Music claim. It never, under any set of circumstances, would have been called upon to defend Mr. Tibble or Holland and Knight, which was insured by CNA. And in fact, ISBA's policy had an attorney prior exclusion for acts or omissions committed by Mr. Tibble, the date of which was April 2003. So it was not, by its endorsement in the policy, it was never covering any acts or omissions committed or allegedly committed by Mr. Tibble prior to April 1, 2003. Isn't their argument more, I mean, I think they probably would recognize that they would never be called to defend that, but isn't their argument more that had we known about that lawsuit, we would have, they take the position, we would not have issued the policy with Mr. Tibble? Because we know that he's one that's subject to multimillion dollar claims. They've taken that position among other, their position shifts from time to time. The representative said we might have offered it with Mr. Tibble. We might not have offered it with Mr. Tibble. Richard Tarullos, on behalf of the firm, testified that it was the end of December, and if the firm had been offered a policy without Mr. Tibble, they would have taken it, because at that point they needed to have a policy. The materiality issue goes to whether the chances of the events insured against are going to be materially changed, and the Tango Music lawsuit did not change under any reasonable standard what ISBA was potentially exposed to. But wouldn't it change the person or parties they're insuring, regardless of whether they have a claim to defend? Not necessarily, because they already knew that Mr. Tibble had been suspended from the practice of law for 30 days as a result of alleged, and I suppose we have to take that as true since the suspension happened, as a result of client neglect found by the ARDC and approved by the Illinois Supreme Court. The client neglect issue was the same issue that was alleged in the Tango Music lawsuit. So they knew about client neglect, or client neglect allegations, yet they chose to insure Mr. Tibble nonetheless. The other argument that ISBA made is that they needed to know about the damage allegations in the complaint. Well, of course, as the justices know, at the trial court level, certainly here in circuit court, all you need to do, you can have a $5 million claim, but all you need to do is say you have a $30,000 jurisdictional minimum claim. So what somebody, what an attorney who can allege anything they choose to in a complaint alleges, that is not, again, by any reasonable standard, a measure by which you can say, oh, it's material to ISBA, they had to know how much was alleged in the complaint. That just does not really hold up. So there was nothing objectively material about the Tango Music lawsuit that should have resulted in a court finding that precision was appropriate for the 2008 policy, and certainly nothing for the 2009 policy, as we've already discussed. A couple of other points that I just want to mention briefly as I close. There is pending, but there is a case on the Innocent Insured Doctrine. That's a case that was issued by this district, and is up, admittedly, on a PLA in front of me, but the Ticillino case remains good law. And the Ticillino case says that given Illinois' policy favoring coverage, we should not be penalizing attorneys who had no knowledge of any potential wrongdoing that another attorney in the firm might have engaged in or concealments. So if the court finds that there was any sort of misrepresentation, which the court should not do, then the common law Innocent Insured Doctrine should preclude full rescission of the policies in any event. The trial court did not think that partial rescission was appropriate and did not order partial rescission. The other issues that I can rest on my briefs are with respect to the reimbursement costs, which should not have been awarded, and the court costs under Section 5, slash 5-108, which the trial court erroneously awarded as prevailing party costs. And I will just rely on our briefs to that extent. So unless the court has anything further? Thank you very much. Thank you, Your Honors. Mr. Chimmers, why don't you proceed with your... Thank you, Your Honor. Again, may it please the court, counsel, for the Plaintiff's Appellate, Robert Chimmers, with Peter Serdelis on the brief for ISBA Mutual. I said 10 minutes. If the court has questions about ISBA v. Ticillino Interpenis, LLC, I'll take 15 minutes. I argue that is not the case. I brought that case to the Supreme Court two weeks ago, November 18th. What do you think? I'll tell you, Your Honor. No, no, no, I'm kidding. In 37 years, I don't make predictions. I've argued, as an attorney of record, almost 550 published opinions I wouldn't venture against. I find it neither professionally prudent or wise. It's not. Justice Liu, you asked a question about the meaning of the word claim. I don't think there's any lawyer that has a question or a problem with the term claim, especially when asked on an application for a lawyer malpractice policy. Has any member of the firm had a claim made against him in the last five years? Judge Mason, now Justice Mason, said no reasonable lawyer would have an interpretation of that question as limited to matters not yet in suit. She held, as a matter of law, the term was clear, plain, ordinary and unambiguous. Would you take the same position if the question was had any lawsuit been filed against you in the last five years and then, you know, after the policy issues, your client finds out that at the time, right before the application was filled out, that the attorney was notified that they were going to have a claim against him? Not a lawsuit, but at that point a claim. I mean, would your position would probably be the same if you were on notice? It would. So you're saying a claim and a lawsuit are the same thing? For the purpose of that question, absolutely. And the trial court so held as a matter of law. I don't think any trial judge who was a lawyer, now a judge, needs an expert to tell him or her what the word claim means. But you'd agree that lawyers live by their interpretation of words? Except that didn't occur here. Mr. Tarullos looked at the question and sent a questionnaire to the other five or six lawyers in the law firm and asked them his own questions, which those questionnaires are in evidence. And the lawyer who had the claim against him, Mr. Tibble, said no. In fact, Tibble had been with the firm six years, six years before he even told them about Tango Music and he told them after my client filed the rescission lawsuit. About the lawsuit? About Tango Music lawsuit. That's correct. Mr. Tarullos, who testified, had no occasion to parse that question in the manner which his lawyer did and did several times in the trial court and which the so-called expert attempted to do as well. The fact is they had a question, does any member of this law firm, does anyone have a claim? They went to every lawyer in the firm, they all said no. Tarullos signs the application, he says no. Under Section 154 of the Insurance Code, if Mr. Berman is correct, that is the touchstone. It sets forth the requirements. The misrepresentation must be in writing, which it was. It must be on the application, which it was. It must be material, and it was uncontroverted by the underwriter, Bonnie Hill, that it was, excuse me, material. And it must be made on behalf of the insured. There is no carve-out in Section 154, notwithstanding Justice Reyes's opinion, for an innocent insured. I would suggest to the Court that this is not an issue of contract interpretation, which is the direction that the panel of the Court a year ago took in the Tussolino case. This is a question of contract formation. There is no authority, and the defendants didn't cite any in their opening brief, they didn't cite any in their reply, and they didn't cite any now, that the rules of construction are applicable to an application for a policy of insurance, such as you construe words against the drafter. The word claim is clear and unambiguous. It includes suit. The fact that the 21B asks about claim or suit, the question was different. It asks, are any of you aware of an incident or circumstance that may lead to a claim or a suit? An incident or circumstance is, did I do something that I should come forward with because if I disclose it, then we're honest? Bear in mind, Illinois has what is referred to as post-claim underwriting. This case is an example of that. ISBM mutual, upon the application that was presented, which was held as a matter of law to have contained any misrepresentation, and which was held by the manifest way of the evidence, which misrepresentation was material, led to the issuance of a policy. That policy was renewed, and that renewal policy, by the way, is in the record. I believe it's C694 to 727, and the policy, Justice Lew, is identical. Counsel, I have a question. On the language in Section 21A, during the past five years, has any claim been made against an applicant or predecessor firm? Under your argument that a demand on the insurer is the same as a lawsuit, how would you define a claim being made in the lawsuit context? Is it when it's filed? Because if that's the case, what if nobody is aware of it being filed, is that a misrepresentation, or is it when it's served? The policy defines the term claim as a demand in writing for money or services or the service of a suit or arbitration. But we covered that issue. I asked counsel for the appellant that question, was a copy of the policy tendered with the application, so that there would be a definition of the claim in the first instance? And the second instance, are the definitions of the policy incorporated into the application? You've just explained to me, as part of your argument, that an application is not construed the same way legally as a policy. So you can't really read the policy definitions into the application, can you? No, and I only said what the policy defined because you asked how it defined it. There was nothing that prevented someone with a question as to the meaning of the word claim, calling ISP and mutual and saying, what do you mean? What does it include? Nothing prevented that from happening. Since that may have been necessary, are you saying the word claim is ambiguous? Are you saying the word claim may have been ambiguous, since you're suggesting that maybe the insurer should have contacted the insurer? No. I am saying nothing precluded anyone with a question as to the meaning of a simple word such as claim from contacting the insurer and asking what it means. It didn't happen here. Has any claim been made, I think, unmistakably to an attorney? Within five years. Correct, within five years, and that was made within five years. A lawsuit was filed, and their argument is the claim was made in 02. Once the claim was made, the lawsuit was a result of the claim. It wasn't a claim in and of itself. And what is more important to an insurer that is underwriting a risk for lawyer malpractice than knowing if the lawyers in the law firm have been sued? Why didn't they ask the question? Have any of you attorneys ever been sued? Not within five years, seven years, ten years, ever. Have you ever been sued? That would have covered every contingency, and if any of them had said, nope, never been sued, you have the broadest protection ever for a claim for rescission. And it may even be more difficult, Justice Pierce, if that occurred here where you have a law firm of only six or seven lawyers, and one of them doesn't come forward and tell the managing partner that he was sued and why he was sued until the law firm he's in was sued. What do you do with an 1800 lawyer law firm that has 18 or 30 offices? But that's the problem, as I see it, with your position. If you had asked the question, have any of you been sued professionally, then the answer to that is I have been sued or I have not been sued. Here you're using claim, lawsuit, in five years. If it's important to the insurer of whether the party they're going to insure has ever been sued, why don't they ask the question? Well, I would submit that the ruling as a matter of law by Judge Mason at the time was clearly correct from the standpoint that she determined as a matter of law that no reasonable lawyer would not understand what the word claim meant in question 21A. 21B is a different context. That inquires about an incident or circumstance that may lead to a claim or a suit, the incident or circumstance being, did anybody in this law firm do anything we should know about so we tell it to the insurance company before a claim or a suit? Right. That's different. That's different than having been sued because. Go back to 21A. Why didn't they just ask the question, have you been sued? I think they did by asking if any member of this law firm had a claim against in the last five years. I respect your position. So what's the basis for rescinding the 2009 policy? What did they misrepresent? In the 2009 policy, it's like making a movie. You can't have a sequel without the original picture. You can't have a renewal policy without the initial policy. Since Illinois law recognizes. But let's focus on your client. The basis of your claim really is your client got misled into insuring someone or a firm they wouldn't have insured, and you're saying what caused them to issue the 2009 policy? Did they do this automatically or did they ask, do you want to be renewed, fill out some paperwork, and we'll decide based upon what you give us whether we're going to do that? It's basically the latter, and the policies are identical. And the fact is they didn't discover the misrepresentation and the fact that the initial policy would not have been issued until after the issuance of the renewal. And under section 154 for this type of policy, that's permitted. Well, let me ask you then, if your position is correct, what would the prohibition be for an insurer to go back eight years for a client that they've been insuring for eight years and rescind the latest policy based upon an eight-year-old application that had a misrepresentation? Does that give an unfair advantage at least to the insurer? Well, the basis for rescission is not punishment of an insurer. It's getting out of an agreement that was entered into based on false pretense. Okay, but how far back can you go as far as a renewal policy? A suit on a written contract is 10 years. There's a 10-year statute in Illinois. Now, bear in mind the statute, section 154, has its own limitation provision in it, but not for this type of policy. There is a one-year provision, or the renewal, whichever is less, for the policies that are identified in section 143.13A, B, and C of the Insurance Code, which are... And how does that work in this case? It doesn't apply. It doesn't apply. So I still don't quite understand how you can rescind the 09 policy based upon the 07 application when nothing in the record indicates that your client was misled in issuing the 09 policy. The only thing that misled the client to issue the 09 policy was the fact that it issued the 08 policy based on an application which contained immaterial misrepresentation, and under section 154, that entitles the insurer to seek rescission. There is no prohibition in section 154, which is the expression by the legislature of the intent behind rescinding policies, not contracts in general, but insurance policies, for how it's done. A material misrepresentation in the application on behalf of the insured, which goes to the materiality of the risk to be assumed. That's what we proved at trial, and that's what we established at summary judgment. The fact is, Illinois law says there is no independent obligation on the part of an insurance company to investigate the accuracy or veracity of the information given in an application. The duty lies with the insured to be truthful. Illinois law permits what is referred to as post-claim underwriting. That is to say, after a claim is made, the company, through whatever investigation they do, can say, wait a minute. If we knew that Mr. Tibble was sued in Tango Music, we wouldn't have issued this policy. We were misled. That being misled with the underpinning would be the initial policy. But there was no testimony in this record, as I see it, saying we would not have issued the 09. That's correct. Right. So the only evidence was we would not have issued 08, and it's at best for you, Silent, that we don't know what you would have done with 09. It's just there, so let's rescind 09 because we're going to rescind 08. Well, bear in mind, it's like building blocks. This is a claims-made policy. The 08 policy had no claims made. The claims came in 09, during the year of the renewal policy. Right. And when they're presented, that's when the so-called vernacular would be post-claim underwriting occurred, and ISB and Mutual realized for the first time they were misled. Wouldn't logically one say, and how were you misled into issuing the 09 policy? And your answer is, well, we weren't. We were misled before that. And because we were misled before that, we should be allowed to go from that earlier point forward and wipe everything out. Well, again, there is nothing in Section 154, which governs the rescission of policies, that says you can't do that. You can't do that, Justice Pierce, with respect to an auto policy, a fire policy, or a homeowner's policy. That's what Section 154 says. That's the last sentence where it talks about the policies that are within Section 143.13A, B, and C of the Code. Those policies have a one-year limitation. In other words, if you lie to the insurance company and the claim is made after the first renewal, you'll get free coverage, because the carrier can't seek rescission. Well, if there's nothing that says that in the statute that says you cannot do that, then it being an equitable remedy rescission, then there should be some vehicle for a court of equity to say that you cannot do that. Well, I would suggest to the Court, and we didn't cite it in our brief, but if I may, I would suggest to the Court that you look at Standard Mutual Insurance Company v. Jones, which was decided by the Fourth District Appellate Court. In that case, there was an auto policy, and Mr. and Mrs. Jones were asked on the question, asked on the application, list all residents, licensed or not. They forgot they had a 16-year-old and an 18-year-old. The 16-year-old had no license. The 18-year-old had two accidents. Standard Mutual learns about that after the first renewal, after the 16-year-old had a serious auto accident, injured two people, and totaled two cars. Rescission suits filed. The Fourth District says, too bad. Too bad because the statute says one year or renewal, whichever is less. So basically, if you commit fraud and you get away with it for six months, you get free insurance coverage. We argued in that case a discovery rule. Every statute of limitations in Illinois has a codified discovery rule. They said no. In fact, I was told when I argued that case, you're in the wrong court. Go across the street. Go to the General Assembly. Make the argument there. But that case is the essence of the end of post-claim underwriting. But this policy isn't subject to that one-year limitation. That case is the extreme case. That case says, in effect, if we don't find out about it, the fraud fees are rewarded with free coverage. And I don't think any court under any circumstance should tolerate a fraudulently procured contract. Counsel, does the 2009 policy refer to the 2008 policy or to the 2008 application? No. Other than it has the identical number except the suffix instead of dash 1 is dash 2. Everything else on it is the same. Terms, conditions, everything. So it doesn't refer to the earlier policy or application, correct?  Why don't you wind up your argument, counsel? What I would suggest to the court is the testimony of Mr. Teroulas that he would have accepted the policy with an exclusion for Mr. Tibble was nothing more than hindsight. It was not reasonable and it was properly stricken by Judge Mason. The ruling with respect to the term claim as a matter of law being clear and unambiguous was unmistakably correct. The ruling by the court with respect to the evidence it heard was also correct and the manifest weight of the evidence would suggest that Bonnie Hill's testimony that knowing whether a claim, a suit, was filed against a law firm and its lawyers was very important to the underwriting determination. As Justice Pierce asked Mr. Berman, this was not a question about whether ISB and Mutual would be saddled with any part of the Tango Music case. What it was was it would be tangled with the lawyer that caused the Tango Music case. And it's not just a corner musician in that case. It's the rights to certain years of David Bowie music. He's a rock icon, some people think. But that being said, it's not just any lawyer makes up a number for the adamnum in it. That was the amount that was sought. Mr. Tibble was the cause of the lawsuit. And we would suggest to the court that for all the reasons I've indicated now and those in our brief that I can't mention at this time, I'd ask the court to affirm. Thank you. Mr. Berman. Some brief rebuttal. Yes, Judge. I'd just like to comment on a couple of things. Language is important. And this case spins around what ISBA could have asked in an application in the 2008 application, as Justice Pierce pointed out. What it could have put into the 2009 application, such as incorporating the prior application, as Justice Neville pointed out. But it failed to do that. Now, one of the questions I was asked was whether there was, or perhaps it was just a statement by counsel, about whether there was authority for the language of an application, how it's construed. I did cite at page 17 of our opening brief that the Mann v. Supreme Counsel, admittedly it's a 1917 Illinois case, the concept is that the language in an insurance application will be construed against the insurer and liberally in favor of the insured. And, of course, that makes sense. And I would also direct the Court to even the policy itself, which as I discussed with Justice Liu earlier, the applicants did not have, but the policy itself incorporates the application into the contract. So for ISBA to say apply a different standard to applications than you would apply to contract terms, even though ISBA incorporates the application into the policy and therefore it would be construed according to normal policy construction, is, again, a bit disingenuous. ISBA's own definition of claim not only includes a service of a lawsuit, but contrary to what counsel suggested, it is not a demand in writing, but it says a demand received by the insured for money or services or the service of a suit or an incident or circumstance in which the insured has knowledge that may result in a demand. All of these would trigger the claim, and that happened prior to the five-year period. Again, this is an issue of ISBA not asking what it could have asked. We ask the Court to reverse the trial court's summary judgment determination in favor of ISBA and against the insured and vacate all subsequent rulings that follow on that. Thank you, Justices, for your time. Thank you, Counsel. Mr. Berman, Mr. Chimmers, I want to compliment the parties on their arguments and on their briefs. This matter is going to be taken under advisement, and this Court stands in recess.